Marilyn LIDDY and Steven August, Plaintiffs,

v.

Henry CISNEROS, as Secretary and A.M. Villane, Jr. as Regional Administrator for Region II of the Department of Housing and Urban Development, New York Foundation for Senior Citizens, and 51st Capitol Associates, Defendants.

No. 92 Civ. 1840 (RPP).

United States District Court, S.D. New York.

May 25, 1993.

The Legal Aid Society, Civil Appeals and Law Reform Unit, New York City, by Mi-

chelle Adams, Jane E. Booth and Scott Rosenberg, for plaintiffs.

Roger S. Hayes, Acting U.S. Atty. for the S.D.N.Y., New York City by David Koenigsberg, Asst. U.S. Atty., Michael Robinson, Office of Legal Counsel, Dept. of Housing and Urban Development, for defendants Henry Cisneros and A.M. Villane.

Brown & Wood, New York City, by Karen Sexton, for defendant 51st Capitol Associates.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City by Paul Indig, for defendant New York Foundation for Senior Citizens, Inc.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

Plaintiffs Marilyn Liddy and Steven August bring this action alleging that defendants, by refusing them a preference under the section 8 Housing Assistance Payments Program, denied them their rights as disabled persons in violation of (1) section 504 of the Rehabilitation Act of 1973 ("RHA"), 29 U.S.C. § 794 (Supp.1992), (2) sections 804(f)(3)(B) and 808(e)(5) of the Fair Housing Amendments Act of 1988 ("FHAA"), 42 U.S.C. § 3601 et seq., and (3) section 553 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 553.

The parties have made the following motions:

Plaintiffs move to amend the complaint to add Yorkville Gardens Housing Development Fund Co., Inc. ("Yorkville") as a defendant.

Plaintiff Liddy moves pursuant to Rule 65(a) of the Federal Rules of Civil Procedure for preliminary injunctive relief with regard to herself alone.

Defendants Henry Cisneros (the "Secretary"), as Secretary of the United States Department of Housing and Urban Development ("HUD"), and A.M. Villane, the Regional Administrator of HUD's Region II (New York City) Office (referred to collectively as the "federal defendants"), move to dismiss the complaint pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure or in the alternative for summary judgment pursuant to Rule 56(b).

Defendant 51st Capitol Associates ("51st Capitol") moves to dismiss the complaint pursuant to Rule 12(b)(6) and Rule 56.

In opposing the motions for summary judgment, plaintiffs cross-move for a continuance pursuant to Rule 56(f).

For the reasons set forth below, defendants' motions to dismiss pursuant to Rule 12 and Rule 56 are denied, and Plaintiff Liddy's motion for preliminary injunction is denied.

## BACKGROUND

### I. SECTION 8 HOUSING

#### A. Statutory and Regulatory Framework

Plaintiffs are handicapped individuals who currently receive the benefit of subsidized housing under the section 8 Housing Assistance Payments Program of the United States Housing Act of 1937, as amended by the Housing and Community Development Act of 1974, codified at 42 U.S.C. § 1437f (Supp.1992) ("section 8"). The section 8 program is administered by HUD, and its purpose is to aid lower income families most in need of housing to obtain a decent place to live. See 42 U.S.C. § 1437f(a); 24 C.F.R. § 880.101(a)(1) (1991). Section 8 authorizes the Secretary to enter into contracts to make housing assistance payments to private owners with respect to programs involving existing housing in which some or all of the units are to be leased to lower income families (sometimes referred to as "assisted tenants"). 42 U.S.C. § 1437f(a), (b). Section 8 mandates that all such contracts between HUD and private owners "shall provide ... [that] the selection of tenants for such units shall be the function of the owner...." 42 U.S.C. § 1437f(d)(1)(A). However, HUD prescribes the eligibility requirements for section 8 programs and has issued regulations pertaining thereto. See, e.g., 24 C.F.R. §§ 812, 813, 880.603(b).

#### B. Eligibility Requirements for Non–Handicapped Persons

In adhering to eligibility requirements, owners are required to comply with federal

preference rules established by federal statute, 42 U.S.C. § 1437f(d)(1)(A), and HUD regulations, 24 C.F.R. § 880.613(a), (c); *see Occupancy Requirements of Subsidized Multifamily Housing Programs*, HUD Handbook, 4350.3, § 2–19 (Sept.1988) ("HUD Handbook"), Maitland Aff., Exh. A. Owners are required by both 42 U.S.C. § 1437f(d)(1)(A) and 24 C.F.R. § 880.613(c) to give federal preferences to three categories of applicants for section 8 subsidized housing: (1) persons occupying substandard housing, including families that are homeless or living in homeless shelters; (2) persons paying more than 50% of their income for rent; and (3) persons who are involuntarily displaced at the time they are seeking assistance. 42 U.S.C. § 1437f(d)(1)(A)(i); 24 C.F.R. § 880.613(c). Accordingly, under the existing federal preference rules governing admission, applicants for section 8 housing who qualify for one or more of the three federal preferences listed in 42 U.S.C. § 1437f(d)(1)(A)(i) and 24 C.F.R. § 880.613(c) are given priority over applicants who do not so qualify.

An applicant may claim qualification for a federal preference "by certifying to the owner that [he or she] qualif[ies] for a preference under" the three categories noted above. "An owner must accept this certification, unless the owner verifies that the applicant is not qualified for a Federal preference." *Id.* § 880.613(c)(2). Accordingly, "[b]efore executing a lease or occupancy agreement with an applicant who has been offered assistance on the basis of a Federal preference, the owner must require the applicant to provide verification that he or she qualifies for a Federal preference." *Id.* § 880.613(c)(3).

If an owner of a section 8 housing project determines that an applicant for section 8 housing does not qualify for a federal preference under 24 C.F.R. § 880.613(c), the owner must provide the applicant with prompt written notice of such determination. The notice must explain the reasons for the determination, and "state that the applicant has the right to meet with the owner or the owner's designee to review it." *Id.* § 880.613(k).

### C. *Eligibility of Handicapped Persons*

Housing that meets the needs of handicapped persons is administered separately under the section 8 program. However, the preferences enunciated in 42 U.S.C. § 1437f(d)(1)(A) and 24 C.F.R. § 880.613(c) are also applied to that class of tenants. The regulations also provide that "[t]he applicant may exercise other rights if the applicant believes that he or she has been discriminated against on the basis of ... handicap." 24 C.F.R. § 880.613(k). HUD regulations require that the "owner must apply the Federal preferences in a manner that is consistent" with other applicable federal requirements. 24 C.F.R. § 880.613(b). Thus, with respect to the occupancy of those units specially designed for the handicapped—the units which are the subject of this litigation—a handicapped person without one of the federal preferences under 42 U.S.C. § 1437f(d)(1)(A), but meeting the other qualifications for residence in section 8 lower income housing, must be given priority over a non-handicapped individual with a federal preference. *See* 53 Fed.Reg. 1122, 1130 (1988). The regulations contained in 24 C.F.R. pt. 8, entitled "Nondiscrimination Based on Handicap in Federally Assisted Programs and Activities of the Department of Housing and Urban Development," require owners of section 8 housing units which are handicap accessible to "maximize the utilization of such units by eligible individuals whose disability requires the accessibility features of the particular unit." 24 C.F.R. § 8.27(a). Thus, under the regulations the owner must first offer a handicap accessible unit to a handicapped person already living in the same project but in a non-accessible apartment. Thereafter, the owner can offer this unit "to an eligible qualified applicant on the waiting list having a handicap requiring the accessibility features of the vacant unit." 24 C.F.R. § 8.27(a)(1), (2).

### II. *THE REGION II BOOKLETTER*

The HUD Bookletter–2, dated November 17, 1987, ("Bookletter") from the HUD Regional Office, Region II, states that HUD regulations "grant to the field office the authority to establish conditions governing

rent-up and occupancy of Section 8 projects." Bookletter at 1, Mallow Aff., Exh. E. With regard to applicants, like plaintiffs, who already reside in federally subsidized housing, the Bookletter directs that

> the owner will find that some applicants are residing in public or government assisted housing. Such applicants must be assigned a low-priority status and promptly notified to that effect. . . .

> This status may be waived by HUD, however, on a case by case basis. Such waivers usually apply to situations that allow mobility impaired families to move into Section 8 apartments designed for the handicapped.

*Id.* at 2–3.

### III. *PARTIES* [1]

Other than federal defendants Cisneros and Villane, the parties are the following:

Putative defendant Yorkville is a non-profit organization which owns Yorkville Gardens, an apartment building located at 225 East 93rd Street in Manhattan, New York which has been federally subsidized by HUD since May 1, 1985, pursuant to section 8.

New York Foundation for Senior Citizens, Inc. (the "Foundation") is a non-profit agency located throughout New York City which serves New York City's elderly citizens and that sponsors Yorkville Gardens for the section 8 program.

Defendant 51st Capitol is the owner of Capitol Apartments, a housing development located at 840 8th Avenue in Manhattan, New York which is subsidized through HUD's section 8 New Construction program.

*Marilyn Liddy*

Since 1974, Ms. Liddy has resided in a section 8 housing project, the Wardell Apartments ("Wardell"), located in Astoria, Queens, New York. Her only source of income is Supplemental Security Income ("SSI") payments of $524 per month, plus $90 per month in Food Stamps. She receives the SSI benefits because she is physically disabled and unable to work. Liddy

Decl. ¶ 4. "Ms. Liddy is an individual with severe physical and emotional disabilities." Compl. ¶ 40. Her "hands and feet are severely deformed," and "she suffers from a disease similar to Lupus which causes ulcerations on her legs." Compl. ¶ 40. In addition, according to paragraphs 40 and 41 of the Complaint, which are supported by the affidavits submitted by plaintiffs:

40. . . . Years of arthritis and peripheral vascular disease, which results in severe circulatory problems, have weakened the skin covering Ms. Liddy's feet and legs. Her skin in these areas is often swollen and broken and infections are common. Ms. Liddy suffers from Raynaud's disease, an extreme sensitivity to cold which also compromises her circulation and causes infections in her fingertips. Ms. Liddy is also asthmatic and experiences chronic depression in part as a result of her physical condition.

41. The combined result of these illnesses is that Ms. Liddy's mobility and ability to travel are seriously impaired. Although Ms. Liddy is sometimes able to walk, she must do so with the assistance or [sic] a cane or walker; often she must rely on a wheelchair. Her maximum walking distance is three to four blocks. Because of the delicate nature of her skin, prolonged exposure to cold weather causes Ms. Liddy to experience extreme pain.

According to affidavits submitted for the summary judgment motion, Ms. Liddy's disability seriously impairs her mobility and ability to travel, and she now relies on a wheelchair at all times. Liddy Decl. ¶ 8.

Ms. Liddy's "medical problems often require specialized treatment." Compl. ¶ 43. She is an out-patient at the Hospital for Special Surgery, New York Hospital and the East Side Center for Special Therapy, each of which is located in Manhattan. However, because "travel to Manhattan is so difficult for her," Ms. Liddy "frequently cannot be seen by specialists at these hospitals and treatment centers. Instead, she must rely on Astoria General hospital," located in

---

1. Plaintiffs Liddy and August have sued individually and on behalf of an alleged class of similarly situated persons. Compl. ¶ 18–26. No motion for class certification has been made, and no class has been certified.

Queens, "which does not offer the kind of specialized care that she requires." Compl. ¶ 43.

In addition, "there are no curb cuts within eight blocks" of Ms. Liddy's apartment to enable her to maneuver her wheelchair from one block to another, and "there is no drug store or supermarket within three to four blocks" of the Wardell Apartments. Liddy Decl. ¶ 20. Because Ms. Liddy must take antibiotics to treat her frequent infections, her lack of access to medicine "is a significant problem." *Id.* In sum, Ms. Liddy's disabilities are "aggravated by the lack of" necessary medical and other "services and facilities near" her current residence in Queens and by her lack of access to the medical services that she requires.[2] *Id.* ¶ 19.

Ms. Liddy also has difficulty maneuvering within her current apartment. Because the doorway to her bathroom is too narrow to permit wheelchair access, she must "rely on a commode in order to go to the toilet," and "must bathe [her]self from a make-shift basin in the living room." *Id.* ¶ 22. Ms. Liddy also has trouble entering and exiting the Wardell Apartment building because the ramp to the building is too steep for her to negotiate with her wheelchair. *Id.* ¶ 23. As a result, she has a home attendant[3] push the chair up and down the ramp. In addition, Ms. Liddy claims the elevator in the Wardell Apartment building does not always work, and therefore she cannot always access her apartment unit. *See* Liddy Yorkville Gardens Application, Mallow Aff., Exh. B.

By application dated November 15, 1984, Ms. Liddy sought a transfer from her apartment in Queens by applying for a handicapped apartment at Yorkville Gardens. In her application, Ms. Liddy informed Yorkville that her health problems were compli-

cated by several deficiencies in her current building. She also indicated that she lived in a section 8 apartment in Astoria, Queens. In her affidavit, Ms. Liddy states: "I sought such a transfer to Yorkville Gardens to enable me to treat and control all of my medical conditions more adequately. All of my sources of treatment, advocacy, social interaction and vocational rehabilitation are more easily accessible from Yorkville Gardens than from my current address." Liddy Decl. ¶ 26.

By letter dated December 17, 1985, Mary Jane Cannon, then property manager of Yorkville Gardens, notified Ms. Liddy that in accordance with HUD regulations, she was granted low priority status because she already lived in federally assisted housing. In the letter Ms. Cannon told Ms. Liddy: "You have the right to appeal this decision within 14 days from the date of this notice. To appeal, call or write our office at the number/address listed below." Mallow Aff., Exh. C.

Ms. Liddy was assigned an application number in accordance with the low priority determination but did not appeal her low priority status or otherwise contact Yorkville within the fourteen day period specified by Ms. Cannon in her December 17, 1985 letter.

On August 15, 1989, pursuant to HUD regulations, Yorkville sent all persons on the Yorkville Gardens apartment waiting list, including Ms. Liddy, a federal preference check list and cover letter. *See* Mallow Aff., Exh. D. Ms. Liddy returned the check list, stating therein that she was entitled to a federal preference because she was currently living in substandard housing. She noted that her apartment was "dilapidated (endangers the health, safety, or well being of the family)," and that the bathroom was "not

---

2. Dr. Susan Massad, M.D., Ms. Liddy's internist and the physician upon whom she relies for regular primary health care, states that "Ms. Liddy's physical condition is slowly deteriorating," that "improved access to medical care is critical if further deterioration of her health is to be prevented," *id.* ¶ 16, and that "it would be a tragedy if Ms. Liddy were forced to terminate relationships with her long-term care providers because she is unable to transfer to housing that is accessible to those providers." *Id.* ¶ 18.

3. 24 C.F.R. § 8.24(b) provides that owners of section 8 housing "may comply with" the handicap access regulations contained in HUD's regulations regarding section 8 by "assignment of aides to beneficiaries." 24 C.F.R. § 812.2 defines a "live-in-aide" as a "person who resides with a[ ] .... Handicapped Person ... and who (a) Is determined to be essential to the care and well-being of the Person[ ]; (b) Is not obligated for the support of the Person[ ]; and (c) would not be living in the unit except to provide the necessary supportive services."

useable because it is not wheelchair accessible." *Id.* She also stated, in a form letter attached to the preference check list: "I am still interested in obtaining an apartment and want my application to be considered active on the waiting list for an apartment at [Yorkville] Gardens." *Id.*

Ms. Liddy's name remains on the waiting list for one of Yorkville Gardens' thirteen handicapped apartments. There are currently ten persons on the waiting list for a handicapped apartment at Yorkville Gardens, including some applicants who are both handicapped and have a federal preference because they qualify for one or more of the three federal preferences. Mallow Aff. ¶ 6. Accordingly, if Ms. Liddy does not secure the next handicap accessible apartment, the apartment will go to another handicapped person ahead of her on Yorkville Gardens' waiting list.

*Steven August*

Steven August resides at the East 21st Street Apartments, which are section 8 housing projects located in Brooklyn, New York. Mr. August suffers from severe psychiatric, emotional and physical disabilities, including fibromyalgia, a mobility impairment which forces him to walk with a cane and make frequent rest stops. August Decl. ¶ 5. Mr. August claims that his mental disorders limit his ability to travel and are aggravated when he is isolated from his medical support services. He also states that the location of his present apartment in Brooklyn and the difficulty he experiences in traveling have caused him to miss many of his medical appointments with his treating physicians, all of whom are located in Manhattan. *Id.* ¶¶ 7–8. Mr. August travels by ambulette, and because of the length of the ambulette trip from Brooklyn to his treating physicians in Manhattan, he is physically exhausted by the time he arrives and experiences reduced clarity, concentration, and impaired ability to communicate his symptoms to his doctors. Also as a result of the trip, he often experiences malcoordination, difficulty walking, body pains, and exhaustion for long periods

after the trip is complete, causing him to miss later medical appointments. *Id.* ¶ 9.

In June 1989, Mr. August sought a transfer to section 8 housing at Capitol Apartments, located at 840 8th Avenue in Manhattan and owned by Defendant 51st Capitol. *Id.* ¶ 10. He contacted Tracy Jones, assistant director of subsidized housing for Arco Management Corporation ("Arco"), which owns and operates defendant 51st Capitol. Ms. Jones informed him that unless he qualified for a federal preference, he would be placed on the waiting list behind those handicapped individuals who either had requested a transfer before him, or had qualified for a federal preference. Langan Decl. ¶ 4.

Accordingly, Mr. August was placed on the waiting list for an apartment at Capitol Apartments. August Aff., Exh. A. In September 1989, Mr. August attended an eligibility interview with Mr. David Margules, the property manager at Capitol Apartments. During the interview, Mr. August informed Mr. Margules that he was already living in section 8 housing. At the end of the interview, Mr. Margules instructed Mr. August to submit additional information to 51st Capitol in order to supplement his housing application, including an award letter from the Social Security Administration and a physician's letter stating the nature and severity of Mr. August's disabilities. August Decl. ¶ 11. Mr. August submitted the requested information two days after the interview. Shortly thereafter, Capitol Apartments informed him that he had been accepted for housing and should begin preparations to transfer. *Id.* ¶ 12.

More than a year after the initial interview, 51st Capitol informed Mr. August that his name was "high on the waiting list," and he was shown an apartment unit in Capitol Apartments. By letter dated January 9, 1991, however, Ms. Jones of Arco told Mr. August that he was in fact considered "low priority" under HUD regulations because he was already receiving section 8 assistance.[4] *Id.* ¶ 13 & Exh. D.

---

4. In June 1989 Ms. Jones had erroneously informed Mr. August that if he voluntarily relinquished his apartment and moved out, he would

be considered involuntarily displaced within the meaning of 24 C.F.R. § 880.613(d), and would be eligible for other section 8 housing. After

As alleged in the Complaint and supported by affidavit:

Mr. August subsequently requested that ... HUD give him an opportunity to challenge its refusal to grant him a federal preference and the concomitant denial of a transfer necessary to accommodate his disabilities. In April 1991, ... HUD denied this request. Later that month, Mr. August was informed that the available apartments [in Capitol Apartments] had been rented and that 51st Capitol ... had refused to join in [his] request [to HUD] for a waiver of priority requirements based on medical necessity.

Compl. ¶ 60.

## DISCUSSION

### I. SUBJECT MATTER JURISDICTION

■ The Administrative Procedure Act, 5 U.S.C. § 551 *et seq.*, ("APA"), provides that any person "adversely affected or aggrieved by agency action," 5 U.S.C. § 702, may bring an action to "set aside agency action ... not in accordance with law" or to "compel agency action unlawfully withheld," *id.* § 706; *Jaimes v. Toledo Metropolitan Housing Auth.*, 715 F.Supp. 835, 839 (N.D.Ohio 1989). Plaintiffs need not, as suggested by defendants, specifically invoke the APA to trigger a waiver of sovereign immunity under section 702 and obtain judicial review of HUD's policies or actions. *See B.K. Instrument, Inc. v. United States*, 715 F.2d 713, 724–25 (2d Cir. 1983). *See also Bowen v. Massachusetts*, 487 U.S. 879, 108 S.Ct. 2722, 101 L.Ed.2d 749 (1988); *Chemung County v. Dole*, 781 F.2d 963, 967–68 (2d Cir.1986); 5 U.S.C. § 702. The APA only bars judicial review of agency policies to the extent that "(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." U.S.C. § 701(a); *see NAACP v. Secretary of Housing & Urban Dev.*, 817 F.2d 149, 157 (1st Cir.1987). In the present case, there is no statutory provision precluding judicial review of HUD's policies or practices, and the Secretary has no discretion with respect to complying with the relevant provisions of the

FHAA or the RHA: Indeed, the FHAA prohibits HUD from discriminating on the basis of handicap by refusing to make reasonable accommodations in its rules, policies, practices or services, 42 U.S.C. § 3604(f)(3)(B), and requires that the Secretary of HUD "*shall* ... administer the programs and activities in a manner affirmatively to further" the fair housing, antidiscrimination policies of the FHAA, 42 U.S.C. § 3608(e)(5) (emphasis added).

■ Relying on *NAACP* and *Jaimes* as well as the assignment of responsibility to owners for determining whether applicants satisfy the eligibility requirements for section 8 housing, HUD argues that under the APA judicial review of its actions is permitted only for claims of a pattern and practice of non-enforcement, *i.e.*, where plaintiffs claim HUD was aware of housing projects to which a plaintiff applied which had a discriminatory admission policy in violation of the FHAA or the RHA. HUD Reply Br. at 10. However, neither *NAACP* nor *Jaimes* requires that, as a predicate to the Court's exercise of subject matter jurisdiction, HUD be aware prior to the initiation of litigation of the discriminatory effect of its action or inaction. *See NAACP*, 817 F.2d at 158, 160; *Jaimes*, 715 F.Supp. at 839. Because plaintiffs' claims regarding HUD's alleged policy and practice of instructing section 8 owners to deny transfers to disabled persons already occupying section 8 housing constitute claims that the federal defendants have failed to comply with the FHAA and RHA, they are reviewable under the APA. Accordingly, the federal defendants' motion to dismiss plaintiffs' claims on this ground pursuant to Rule 12(b)(1) is denied.

### II. MOTION TO AMEND

Plaintiffs' motion to add Yorkville as a defendant is unopposed. Accordingly, the motion is granted.

### III. RULE 12(b)(6) MOTION

#### A. The Allegations in the Complaint

In their complaint, plaintiffs allege that it is the federal defendants' "policy and practice

---

checking with HUD representative Evelyn Smith, however, Ms. Jones informed Mr. August that he would not qualify as involuntarily displaced if he

voluntarily vacated his apartment. Langan Decl. ¶¶ 5–6.

to instruct owners [of section 8 housing] to deny disabled individuals the right to transfer between federally subsidized housing where such transfers are necessary to accommodate the individual's disability and to prevent the deterioration of the individual's physical, psychological and emotional health." Compl. ¶ 62. Plaintiffs also allege that the Foundation, Yorkville, and 51st Capitol "enforce this policy and practice pursuant to instructions from HUD." Compl. ¶ 63. In their third claim for relief, plaintiffs allege that "Defendant HUD's policy and practice of instructing owners to deny disabled individuals residing in federally subsidized housing medically necessary transfers without publishing notice of such policy or affording an opportunity for public comment upon such policy constitutes a violation of 5 U.S.C. § 553." Compl. ¶ 68.

### B. The Motion to Dismiss

■ A complaint should not be dismissed under Rule 12(b)(6) for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his or her claim that would entitle plaintiff to relief. See Conley v. Gibson, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957). When passing on a motion to dismiss, the court must accept the allegations in the complaint as true and construe them in favor of the pleader. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974); Cruz v. Beto, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081–82, 31 L.Ed.2d 263 (1972).

■ In moving for dismissal under Rule 12(b)(6), the federal defendants and 51st Capitol contend that HUD has not created a policy precluding handicapped section 8 tenants from moving between HUD-subsidized housing projects because of handicap. These defendants maintain that plaintiffs seek to modify or enjoin a policy that does not exist. However, it is not sufficient for a motion to dismiss to state that an allegation contained in the complaint is false or incomplete. See Scheuer, 416 U.S. at 236, 94 S.Ct. at 1686; Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc., 748 F.2d 774 (2d Cir.1984). Accordingly, the motion to dismiss on this ground is denied.

■ The federal defendants and 51st Capitol also argue that the FHAA and the RHA are general anti-discrimination statutes that do not override 42 U.S.C. § 1437f(d)(1)(A), a specific federal preference statute with an articulated program. The principle that a specific statute will not be overridden or controlled by a general statute obtains only when the two statutes conflict and cannot be reasonably reconciled. Local 1814, Int'l Longshoremen's Ass'n v. New York Shipping Ass'n, 965 F.2d 1224, 1237 (2d Cir.1992); American Land Title Ass'n v. Clarke, 968 F.2d 150, 157 (2d Cir.1992). However, the HUD regulations themselves require that the federal preferences be applied in a manner that is consistent with other federal requirements, 24 C.F.R. § 880.-613(b)(3), and the Secretary of HUD is constrained by the FHAA and the RHA to administer the policies of HUD in a manner to further the policies of the FHAA, Title VIII and the RHA. HUD's commentary to the proposed federal regulation implementing the federal preference system suggests that the FHAA and the RHA do not conflict with 42 U.S.C. § 1437f(d)(1)(A) preferences with respect to housing for handicapped persons. 53 Fed.Reg. 1128–30. Moreover, whether the accommodation sought by plaintiffs pursuant to the FHAA and the RHA constitutes a practical and reasonable accommodation in connection with inter-housing transfers appears to be an issue of material fact. Accordingly, defendants' motion to dismiss on this ground pursuant to Rule 12(b)(6) is denied.

## IV. SUMMARY JUDGMENT MOTION

■ Rule 56(c) of the Federal Rules of Civil Procedure permits the entry of summary judgment only after the parties have been afforded "adequate time for discovery." Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); see Lund's Inc. v. Chemical Bank, 870 F.2d 840, 851 (2d Cir.1989); see Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230, 236 (2d Cir.1985).

At the time the defendants moved for summary judgment, discovery in this litigation had not started. On September 21, 1992, when plaintiffs submitted their reply brief opposing defendants' summary judgment motion, defendants had not yet responded to plaintiffs' first discovery requests for documents and interrogatories served on August 18, 1992. Plaintiffs moved pursuant to Rule 56(f) for a continuance to permit further discovery as to the federal defendants' policies regarding federal preferences and the federal defendants' past use of waivers, if any, to circumvent regulations covering such preferences. Accordingly, defendants' summary judgment motions are denied, without prejudice to renew their motions after the conclusion of discovery or after there has been adequate time for discovery as determined by this Court.

## V. MOTION FOR PRELIMINARY INJUNCTION

Ms. Liddy moves for a preliminary injunction with regard to herself alone. She requests a waiver of HUD's alleged policy prohibiting transfers between section 8 housing projects and permission to move immediately into Yorkville Gardens on the ground that (1) she meets the qualifications for a federal preference under HUD's regulations implementing 42 U.S.C. § 1437f(d)(1)(A)(i), (2) HUD's alleged policy violates the FHAA because it constitutes a refusal to make reasonable accommodations for handicapped people, and (3) HUD's alleged policy violates section 504 of the RHA.[5]

The party seeking preliminary injunctive relief bears a heavy burden of proof, *Pride v. Community School Bd.*, 482 F.2d 257, 264 (2d Cir.1973), and accordingly a motion for a preliminary injunction will be denied "absent a clear showing that the movant has met its burden of proof." *Karmikel Corp. v. May Dep't Stores Co.*, 658 F.Supp. 1361, 1367 (S.D.N.Y.1987) (citations omitted). In general, a preliminary injunction may be granted if the moving party establishes (1) irreparable harm and (2) either (a) a likeli-

hood of success on the merits, or (b) "sufficiently serious questions going to the merits of its claims to make them fair ground for litigation, plus a balance of the hardships tipping decidedly in favor of the moving party." *Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989) (citations omitted).

The fair ground for litigation standard generally is inappropriate "where the moving party seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme," *id.* (citing *Union Carbide Agricultural Products Co. v. Costle*, 632 F.2d 1014, 1018 (2d Cir. 1980), *cert. denied*, 450 U.S. 996, 101 S.Ct. 1698, 68 L.Ed.2d 196 (1981)), and where the case involves a "purely private challenge[ ] to federal action," *U.S. v. 27.09 Acres of Land*, 760 F.Supp. 345, 354 (S.D.N.Y.1991); *see Union Carbide*, 632 F.2d at 1018 (likelihood of success test applied to private challenge to application of federal statute); *Medical Society of the State of New York v. Toia*, 560 F.2d 535, 538 (2d Cir.1977) (likelihood of success test applied to private challenge and injunction denied "where the grant of interim relief may adversely affect the public interest in a manner which cannot be compensated for by an injunction bond"). *But see Carey v. Klutznick*, 637 F.2d 834, 839 (2d Cir.1980) (fair ground of litigation and balance of hardship test where state seeks to enjoin federal agency action) (per curiam).

Because (1) HUD acts in the public interest and in accordance with the section 8 regulatory scheme by giving priority to housing low income families most in need of housing, (2) Ms. Liddy is a private litigant seeking a preference for herself under section 8, and (3) an injunction bond cannot compensate those handicapped applicants with positions predating her on the Yorkville Gardens waiting list who are without adequate shelter, Ms. Liddy must show a likelihood of success on the merits. In any event, she is not entitled to injunctive relief even under the fair ground for litigation test.

---

5. Ms. Liddy claims that this preference permits her to be "placed in the next available, appropriately sized apartment at Yorkville Gardens," ahead of handicapped persons who qualify for the statutorily mandated preferences. Pl.'s Reply Br. at 28.

## A. Irreparable Harm

Ms. Liddy has shown a real danger that she will suffer irreparable harm absent an immediate injunction permitting her to transfer into the next available apartment unit at Yorkville Gardens. In essence, plaintiffs Liddy and August argue that due to their section 8 status and their limited means they are locked into their present residences and denied the opportunity of changing residences although there are real medical reasons for such transfers. Ms. Liddy's inability to transfer to a section 8 housing project closer to her medical providers has caused and will continue to cause her to forgo necessary consistent medical treatment, contributing to a further deterioration of her physical and mental health and stalling what medical progress she has made to date. See Massad Decl. ¶ 16; Braun Decl. ¶¶ 14–15. Furthermore, the location of Ms. Liddy's current housing at the Wardell Apartments makes it extremely difficult for her to satisfy other basic needs such as purchasing food, going to the bank, and acquiring necessary medicines for her medical conditions. This predicament also contributes to a steady deterioration in her health. Accordingly, Ms. Liddy has demonstrated that she will suffer real and imminent irreparable harm due to a continuing decline in her health if her request for a preliminary injunction is denied.

## B. Likelihood of Success

### 1. Preference

Ms. Liddy claims that she qualifies for a federal preference under the substandard housing preference because her housing does not meet the needs of her handicap and therefore is substandard as defined in 24 C.F.R. § 880.613(f), and also because she will be involuntarily displaced within the definition in 24 C.F.R. § 880.613(d).

■ A federal agency's interpretation of its own regulations is ' "of controlling weight unless it is plainly erroneous or inconsistent with the regulation,' " Udall v. Tallman, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965) (quoting Bowles v. Seminole Rock Co., 325 U.S. 410, 413–14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945)); see Soler v. G. & U., Inc. 833 F.2d 1104, 1108 (2d Cir.1987) ("Even if a court concludes that its alternative construction of the agency's regulation is 'more equitable' or 'more reasonable,' the agency's interpretation of its regulation is not thereby rendered invalid") (citations omitted), cert. denied, 488 U.S. 832, 109 S.Ct. 88, 102 L.Ed.2d 64 (1988).

■ Ms. Liddy's claim that due to the configuration of her apartment her present housing endangers her health, safety or well being does not meet HUD's interpretation of "substandard." Under HUD's interpretation of 24 C.F.R. § 880.613(f), section 8 housing facilities are not substandard if they meet certain physical and structural requirements. In determining whether housing is substandard, HUD focuses on objective, generally applicable factors, not on whether the housing unit meets the individual tenant's needs or physical condition. HUD Reply Br. at 17; see 53 Fed.Reg. 1122, 1133 (1988). Thus, HUD defines a housing unit as "substandard" if, among other things, it is dilapidated, lacks "operable indoor plumbing," "does not have a usable flush toilet," "does not have a usable bathtub or shower," lacks safe electricity or any electricity, or lacks a safe or adequate source of heat. 24 C.F.R. § 880.613(f)(1). Housing is dilapidated if "it does not provide safe and adequate shelter, and in its present condition endangers the health, safety, or well-being of a family, or it has one or more critical defects, or a combination of intermediate defects in sufficient number or extent to require considerable repair or rebuilding." Id. § 880.613(f)(2).

Especially in view of the fact that "there are not enough Section 8 housing units to accommodate all who are eligible and willing to take them," Eidson v. Pierce, 745 F.2d 453, 457 (7th Cir.1984), such an interpretation of the regulations regarding substandard housing is not unreasonable; nor is it plainly inconsistent with the terms of the regulations. See Soler, 833 F.2d at 1108.

Ms. Liddy also claims that she will be involuntarily displaced pursuant to 24 C.F.R. § 880.613(d) because her apartment is not readily accessible to her medical providers. In defining involuntary displacement, 24 C.F.R. § 880.613(d) states that an applicant for section 8 housing "is or will be involun-

tarily displaced if the applicant has vacated or will have to vacate his or her housing unit as a result of" (1) a "disaster, such as a fire or flood," or (2) "[a]ctivity carried on by [a government] agency ... in connection with code enforcement or a public improvement or development program," or (3) action "by a housing owner that results in an applicant's having to vacate his or her unit, where," among other things, the "reason for the owner's action is beyond an applicant's ability to control or prevent." 24 C.F.R. § 880.613(d). Ms. Liddy does not meet the plain terms of the regulation. Since the regulation reflects HUD's interpretation of 42 U.S.C. § 1437f(d)(1)(A)(i) and "is not in conflict with the plain language of" that statute, it is entitled to deference. *National R.R. Passenger Corp. v. Boston & Maine Corp.,* —— U.S. ——, ——, 112 S.Ct. 1394, 1401, 118 L.Ed.2d 52 (1992) (citation omitted); *see Soler, supra,* 833 F.2d at 1108.

Accordingly, Ms. Liddy has not met her burden of showing that she qualifies or will qualify for a federal preference under 42 U.S.C. § 1437f or 24 C.F.R. § 880.613.

### 2. *Fair Housing Act Claim*

The Fair Housing Amendments Act of 1988 ("FHAA") amended Title VIII of the Civil Rights Act of 1968 to make it unlawful

(f)(1) [t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of

(A) that buyer or renter;

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available.....

42 U.S.C. § 3604(f). The FHAA defines discrimination as "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations are necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). In addition, the FHAA instructs the Secretary of HUD to "administer the programs and activities re-

lating to housing and urban development in a manner affirmatively to further the policies of [the FHAA and Title VIII]." 42 U.S.C. § 3608(e)(5).

Ms. Liddy claims that the November 1987 Bookletter issued by the HUD Regional Office, Region II, demonstrates that HUD has a "non-statutory" policy that, "absent a HUD waiver, owners must [automatically] assign a low housing priority to disabled applicants living in Section 8 housing." She claims that "HUD may also waive this low-priority status" when transfers are necessary to accommodate the applicant's disability and to prevent deterioration of the applicant's physical, emotional and psychological health. Pl.'s Reply Br. at 19. She argues that 42 U.S.C. § 3604(f)(3)(B) and 3608(e)(5) of the FHAA require that the policy be waived to accommodate her disability because of her relative lack of access to convenient and necessary medical care. Pl.'s Reply Br. at 30; Pl.'s Br. at 27.

These arguments in support of granting an exception to the statutory federal preference system do not mean that Ms. Liddy has demonstrated a likelihood of success.

First, the policy contained in the 1987 Bookletter permitting waivers of the low-priority designation for mobility-impaired tenants of section 8 housing appears to have been eliminated in 1988, when HUD adopted regulations implementing section 8's statutory preference structure, effective July 1988. The 1988 regulations do not deny assisted tenants living in section 8 housing programs transfers if they establish that they qualify for a preference under the statutory preference groupings set forth in 42 U.S.C. § 1437f and 24 C.F.R. § 880.613.[6] *See Final Rule,* 53 Fed.Reg. 1122, 1138 (1988); 24 C.F.R. § 880.613(a)(1)–(2), (b)(2).

Ms. Liddy next argues that, under the FHAA and the RHA, HUD is required to modify the preference system to give priority to disabled persons with a medical need to transfer. However, Congress, not HUD, en-

---

**6.** Of course, it is virtually impossible that such assisted tenants already living in section 8 housing will qualify for preferences. Few, if any, section 8 housing units are substandard, and few,

if any, assisted tenants pay more than 50 percent of their income to rent or are involuntarily displaced. *See* 53 Fed.Reg. at 1138.

acted section 1437f(d), which restricts the categories of individuals eligible for section 8 preferences over other classes of individuals. 42 U.S.C. § 1437f(d). There is case law holding that HUD cannot grant exceptions to or modify the statutory preference system established by Congress. *See Drake v. Pierce,* 698 F.Supp. 1523, 1529–30 (W.D.Wash.1988) (with regard to public housing, Congress intended that "federal preferences be respected in every instance" and does not allow HUD to carve exceptions to federal preference system). *See also Paris v. Dep't of Housing and Urban Dev.,* 988 F.2d 236, 1993 WL 51300 (1st Cir.1993). Accordingly, it may be that plaintiffs' "proper remedy lies in altering the statute itself, rather than challenging its appropriate implementation." *Knutzen v. Eben Ezer Lutheran Housing Center,* 815 F.2d 1343, 1352 (10th Cir.1987); *see Drake,* 698 F.Supp. at 1530 (arguments for making exception to federal preference system "must be addressed to Congress"). *See also* 1437f(d)(1)(A)(ii)(V) (Supp.1993) (once federal preferences are implemented, local preference may be given to handicapped veterans). Thus, if it is not a reasonable accommodation to require HUD to administer the non-discrimination provisions of the FHAA in light of the preferences Congress provided for in section 8, then plaintiffs will not prevail.

■ An accommodation in rules, policies or practices is not "reasonable" for purposes of the FHAA if it "either imposes undue financial and administrative burdens" on the entity making the accommodation, or "requires a fundamental alteration in the nature of [the] program." *School Bd. of Nassau County, Fla. v. Arline,* 480 U.S. 273, 287 n. 17, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987) (quoting *Southeastern Community College v. Davis,* 442 U.S. 397, 410, 412, 99 S.Ct. 2361, 2369, 2370, 60 L.Ed.2d 980 (1979)); *see* 24 C.F.R. § 8.33. The fundamental goal of the statutory scheme of pref-

erences under section 8 is to ensure that low-income persons most in need of housing are placed first. H.R.Rep. No. 153, 96th Cong., 1st Sess. 4, 16, *reprinted in* 1979 U.S.C.C.A.N. 2317, 2320, 2332; *see Eidson,* 745 F.2d at 457; *Knutzen,* 815 F.2d at 1355; *Baker v. Cincinnati Metropolitan Housing Auth.,* 675 F.2d 836, 840 (6th Cir.1982) ("The Section 8 program seeks to provide housing assistance to the maximum possible number of persons who lack safe, sanitary, and decent housing").

Defendants argue that plaintiffs' proposed accommodation would require HUD and section 8 owners to ascertain (1) the medical need of assisted applicants who seek to transfer to subsidized housing better adapted to their medical needs, (2) whether the applicant has satisfactory access to medical care in the area of the applicant's current residence, (3) whether there is accessible transportation, and (4) the extent to which the transit time would affect the applicant physically or mentally. Whether such evaluations are necessary or relatively easy to accomplish is a difficult issue. Such an evaluation may increase the cost of the section 8 program in terms of time, money and personnel and correspondingly reduce the amount of benefits available to low-income families in need of housing.[7] *Eidson, supra,* 745 F.2d at 464. *Compare Majors v. Housing Auth. of Dekalb County Ga.,* 652 F.2d 454, 458 (5th Cir.1981) (agency could easily make limited exception to no-pet rule in housing unit for "narrow group of persons who are handicapped and whose handicap requires ... the companionship of a dog").

HUD's current policy of assigning a low priority to section 8 assisted tenants who do not qualify for a federal preference but nevertheless apply to transfer to different section 8 housing serves to ensure low turnover. Absent such a policy, current handicapped residents would be allowed to move out of

---

**7.** Plaintiffs seem to argue at one point not that HUD should change its policy to require such an evaluation by the owner in each instance, but that handicapped applicants in section 8 housing have a right to a review by HUD on the merits of their application based on extraordinary medical need. Pl.'s Reply Br. at 5, 7. This narrower position appears consistent with the requirement

in 24 C.F.R. § 8.27(a) that section 8 housing owners maximize use of handicap accessible units by persons "whose disability requires the accessibility features of the particular unit." Current HUD policy, however, apparently does not allow an accommodation in the form of a HUD review on the basis of extraordinary medical need.

their section 8 housing and into other handicapped housing more convenient to medical care, possibly on a frequent basis. In a similar context, the Sixth Circuit observed "the resulting increase in turnover" in section 8 housing "would shorten the average length of residency and decrease the percent of housing capacity utilized." *Baker, supra,* 675 F.2d at 840.[8] Thus, there are court decisions indicating that Ms. Liddy may be unable to show that the relief she seeks constitutes a "reasonable accommodation."

For the foregoing reasons, Ms. Liddy has failed to show a likelihood of success of the merits regarding her claim that HUD's refusal to create a preference or to grant an exception to the preference requirements currently in place on the basis of her medical need constitutes discrimination for which she may be afforded relief under the FHAA. Accordingly, her motion for preliminary injunction on the basis of the FHAA is denied.

### 3. *Rehabilitation Act Claim*

Section 504 of the Rehabilitation Act of 1973 ("RHA"), 29 U.S.C. § 794, was enacted to prohibit discrimination on the basis of handicap by any program or activity receiving federal financial assistance. *See Stephanidis v. Yale University,* 652 F.Supp. 110, 113 (D.Conn.1986), *aff'd,* 814 F.2d 654 (2d Cir.1987). Section 504 provides in relevant part:

No otherwise qualified individual with handicaps in the United States ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency....

29 U.S.C. § 794(a). To establish discrimination under Section 504, "a complaining party is required to show that: (1) she is a handicapped person under the Act; (2) she is 'otherwise qualified' for the position; (3) she

was excluded from that position solely because of her handicap; and (4) the program sponsoring the position received federal funding." *Guice–Mills v. Derwinski,* 967 F.2d 794, 797 (2d Cir.1992) (citation omitted).

The application of HUD's rule with regard to Ms. Liddy may not rest solely on a discriminatory motive and may have a nondiscriminatory result. *See Alexander v. Choate,* 469 U.S. 287, 309, 105 S.Ct. 712, 724, 83 L.Ed.2d 661 (1985); *Clark v. Cohen,* 613 F.Supp. 684, 692–93 (E.D.Pa.1985), *aff'd,* 794 F.2d 79 (3d Cir.), *cert. denied,* 479 U.S. 962, 107 S.Ct. 459, 93 L.Ed.2d 404 (1986). First, for reasons already stated, Ms. Liddy does not qualify for any of the three statutory preferences set out in 24 C.F.R. § 880.613. Second, there is no indication from the parties' affidavits that HUD applies a different standard to handicapped applicants who wish to transfer between section 8 housing than the standard it applies to non-handicapped applicants similarly situated. *See Doe v. New York University,* 666 F.2d 761, 776 (2d Cir.1981); *Clark,* 613 F.Supp. at 691–92. Third, handicapped persons who seek to transfer between section 8 housing projects but do not have a statutory federal preference nevertheless have priority over similarly situated non-handicapped persons.

In short, the regulation according low priority to persons living in section 8 housing is neutral on its face, and there is no indication that its effect on Ms. Liddy's application in this case rests "on the improper grounds of discrimination because of ... handicap," but rather on the basis of Ms. Liddy's lack of any of the necessary qualifications for a statutory federal preference. *Brecker v. Queens B'nai B'rith Housing Dev. Fund Co.,* 607 F.Supp. 428, 436 (E.D.N.Y.1985), *aff'd,* 798 F.2d 52 (2d Cir.1986); *see Choate,* 469 U.S. at 309, 105 S.Ct. at 724. Because Ms. Liddy has failed to show that she was denied her request "solely because" of her handicap, her

---

8. Here, defendants have chosen to restrict plaintiffs "to the housing program currently assisting them" apparently "in order to maximize the overall number of persons who receive aid." *Baker,* 675 F.2d at 840. As in *Baker,* "[i]ncreased turnover in" section 8 housing "means that individual units will be vacant more often. While those apartments are empty, others in need will be denied assistance" because the section 8 apartment will go to a handicapped assisted tenant who has elected to transfer on the basis of medical need. Such a policy would increase costs while reducing capacity. *Id.*

motion for preliminary injunction based on the RHA is denied.

### C. Fair Ground for Litigation and Balance of Hardships

Nor has Ms. Liddy sustained her burden under the fair ground for litigation test.

█ The fair ground for litigation test requires the moving party to show both "sufficiently serious questions going to the merits" and "a balance of hardships tipping decidedly in the movant's favor." *Consumers Union of United States, Inc. v. General Signal Corp.*, 724 F.2d 1044, 1048 (2d Cir.1983), *cert. denied*, 469 U.S. 823, 105 S.Ct. 100, 83 L.Ed.2d 45 (1984) (citation omitted). In balancing the hardships, the possibility of harm to other interested persons and to the public interest must also be considered. *Stamicarbon, N.V. v. American Cyanamid Co.*, 506 F.2d 532, 537 (1974) (determination of propriety of injunction "cannot always be made simply by reference to the interests of the parties before the court") (quoting *Virginian Ry. Co. v. System Federation*, 300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789 (1937)); *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 711 (2d Cir.1982).

Considered alone, the immediate financial and administrative hardship to the defendants from a grant of injunctive relief in the form of a waiver solely for Ms. Liddy would be outweighed by the hardship Ms. Liddy would suffer from the denial of such relief.

Ms. Liddy has not shown, however, that the balance of hardships tips in her favor when the public interest and the interests of those handicapped persons ahead of Ms. Liddy on the Yorkville Gardens waiting list are considered. The affidavits submitted by plaintiffs do not rebut the defendants' position that these families face as great or greater hardship. Moreover, requiring a waiver of the federal preference rules in this case and other similar cases may substantially undermine Congress' recognized public interest that the persons covered by 42 U.S.C. § 1437f(d)(1)(A)(i) be housed first.

In the present case, the handicapped applicants who qualify for a preference and stand before Ms. Liddy on the Yorkville Gardens' waiting list for a handicapped accessible unit may be harmed irrevocably in this litigation. In the absence of affidavits fully addressing the issue, it is difficult to define precisely the extent of hardship such applicants would face should injunctive relief be granted. Nevertheless, it seems plain that placing Ms. Liddy and other similarly situated handicapped section 8 tenants ahead of handicapped applicants who qualify for federal preferences and are in line for section 8 housing, *see* 42 U.S.C. § 1437f(d)(1)(A), 24 C.F.R. § 880.-613(c), will harm those applicants by diminishing their chance to receive housing as soon as possible. As the Secretary recognized in establishing rules to implement the federal preference system:

> In many cases, literal application of the preference rule would impose a significant impediment to mobility [impaired tenants]....
>
> ....
>
> On the other hand, most tenants receiving housing assistance under [section 8] have by definition achieved the very state that the preferences are intended to produce: residence in a standard unit with affordable rent. Providing these tenants a preference if they wish to move could place them ahead of other[,] preferred tenants who must endure the conditions that qualified them for a preference for a longer period, before assistance can be made available for them. Arguably, this result is neither fair as a policy matter, nor significantly faithful to the Congressional concern that housing assistance be directed to those with the most pressing housing needs.

53 Fed.Reg. at 1138.

In short, even when the fair ground for litigation test for preliminary injunctive relief is employed, Ms. Liddy has not sustained her burden of demonstrating that the balance of hardships tips decidedly in her favor. This result does not mean, of course, that Ms. Liddy or other plaintiffs like her are forever precluded from being afforded relief from the inflexibility of the federal preference rules in extraordinary cases: It may be that Ms. Liddy's housing need, based on medical necessity, is so extraordinary and urgent that her application warrants review by HUD and

is deemed to outweigh the urgent housing needs of applicants ahead of her on the Yorkville Gardens waiting list. This, however, Ms. Liddy has failed to show on the present record.

### CONCLUSION

For the reasons set forth above, plaintiffs' motion to amend the complaint to add a party is granted, defendants' motion to dismiss and for summary judgment is denied, and plaintiff Liddy's motion for a preliminary injunction is denied.

All counsel are to attend a pretrial conference on June 1, 1993 at 9:00 a.m. in courtroom 302.

IT IS SO ORDERED.